The next case is the Boston Parent Coalition for Academic Excellence Corp. v. The School Committee of the City of Boston et al. Case numbers 21-1303 and 22-1144. At this time, will Attorney Kieser please introduce himself on the record to begin. May it please the Court, Chris Kieser for the Appellant, Boston Parent Coalition for Academic Excellence. I'd like to reserve three minutes for rebuttal if that's possible. Last February, the Coalition sued to enjoin the Boston School Committee from implementing a zip code quota that was designed to make it harder for Asian American and white students to gain access to Boston's three prestigious exam schools. The Coalition represents 14 of its parent members with children who were then sixth graders who had applied to the schools. Each child resided in a neighborhood that, according to BPS simulations at the time, stood to lose seats both compared to the results of previous years and also compared to a citywide only GPA competition without the zip code quota. In the end, five of these children were denied admission simply because they lived in the wrong neighborhood. In their cases, West Roxbury and Chinatown. Had they lived in almost any other Boston neighborhood or had there been a citywide competition on equal terms, these children would now be exam school students. Why were these students and many others subjected to higher admission standards? School committee and BPS working group members made it clear from the beginning that the goal was to design a system that would produce the racial result the school committee wanted. The working group simulations betrayed an almost singular focus on the racial composition of the incoming class at the exam schools. While members of the working group and the school committee spoke in terms of racial balancing to the detriment of Asian American and white students. Three members of the school committee made their intent even more obvious by making racially insensitive statements as the school committee was considering the zip code quota. Then school committee president Michael Locanto was caught on a hot mic making fun of the names of Chinese American parents who had signed up to speak in opposition to the proposal. He resigned the next day. Alexandra Oliver Davila then became acting president, but it turned out that she and her colleague Lorna Rivera had found Locanto's comments particularly amusing, laughing about the incident over text messages. And then later, uncovered text messages showed that Oliver Davila and Rivera texted the disdain for white Bostonians who lived in West Roxbury during the meeting where the committee voted to adopt the quota. They, too, resigned once those texts were revealed. It is no wonder that the district court found that three members of the school committee who voted to adopt the quota displayed racial animus and that the quota was chosen, quote, precisely because of its effect on racial demographics. Mr. Keyser, this case, as you know, was before us previously under an earlier stage. And we were called upon at that stage not to decide the merits finally, but to make a judgment about the likelihood on a preliminary basis of those records. And we did that and published an opinion explaining our thinking as of that time. So now you're at the merits. You've got an opinion from this court saying what we thought were some of the problems that you had with your case. Do you have any specific comments about what we said in that opinion where we might have erred due to the preliminary nature of it? Your Honor, two things specifically have changed since this court decided or denied the injunction pending appeal. The first is the additional text messages that were released in July after this court made its decision. And those actually did change the district court's mind about the case. The district court, after seeing the full record, said that three of the seven school committee members displayed racial animus and that the quota was chosen precisely because of its racial effect. Before you got those text messages, wasn't it also clear from the record as a whole that a primary driving force behind this was to try to reduce perceived underrepresentation of some racial groups and correspondingly, therefore, that would lower the representation of others? Wasn't that clear in the record already? Our position is, Your Honor, that it was clear from the record that the goal was to produce a racial result even before those text messages. However, the text messages did change the district court's mind when it issued the indicative ruling in October. It said that after reading those text messages, the district judge said that the zip code quota is not the celebrated result of transcending racial classification that this court once found it to be. So clearly, after seeing the full record, things had changed. But the other thing that I would mention is that we now have the admissions data from the one year where the zip code quota was in effect. And it shows clearly that there was a significant disparate impact on Asian American and white students. What do you mean when you use the word significant? Your Honor, I don't mean to say statistical significance because for the most part, that is not really at play here. Because when you look at the actual data, we're looking at the GPAs of students who were admitted in each zip code, not comparing two populations with each other. But don't you have a problem if you don't have, and I think we've written about this in other cases, don't you have a problem if you don't have evidence of statistical significance? Because you can flip a coin and get two heads in a row. Wow. Whether you call that a significant or not, no one would say, I therefore decree that coin to be unfair, not producing random results. You need to get certain significance, and we've said that before. That would be true, Your Honor, if we were only relying on a comparison, a straight comparison between the proportion of the class for each racial group last year, the year before the zip code quota, and the results under the zip code quota. But that's only one measure of disparate impact. Another measure was shown by the simulations the working group considered, which actually did end up playing out in reality, where they compared the use of the zip code quota to what would happen is if we remove the test and just had a GPA only citywide competition. And in that event, statistical significance is not at play because it's statistical significance is a concept that. Allows us to determine whether there's any different or whether a policy or random chance caused a change between two populations. But in the simulation here, we're just looking at the same population of students and changing the the rules from a zip code quota to a GPA only competition. And that changing those rules was what caused the disparate impact. And if you look at the actual data that plays out that the average GPA of students who were admitted from West Roxbury was eleven point five one, which is more than one whole GPA point out of twelve above the citywide average. So that's student number ten with a GPA of ten point five would have been admitted. Had student had been in any or not any other zip code, but many of the other zip code that you've done, there is we suggested what the proper baseline would be in our prior opinion for doing a disparate impact analysis. You've not used that baseline. You've suggested an alternative baseline based on admissions percentages. I believe this court suggested a comparison to random a random selection. Exactly. In the initial, which is the customary disparate impact baseline. That's true. And that's true in some context. But even if we were to have a comparison to where you say some context, cite me one case where a disparate impact was found to be valid and random distribution was not the baseline. Well, your honor, in this court, I don't believe that this context has come up before. But the Fourth Circuit's decision in McCrory is is illustrative there because the court simply looked at the difference between the usage in the different mechanisms that were taken away or limited early voting, senior registration, and compared them to. It was more or less a comparison to what was used before and what is would be available now. There was no statistical analysis needed for that. But in any event, in this case, even if you did require a comparison to random chance, that would not that doesn't mean there's no disparate impact here. For instance, the total admissions rate to the exam schools in the relevant year was 58 percent. So since there were that. So under a random distribution, 85 students would have been admitted from West Roxbury. And in actuality, only 69 were admitted. The same is true in Chinatown. A random distribution would have received 19 offers and they actually only received seven. And if you go up and down through the zip codes, it's the zip codes with more white and Asian students received fewer offers. And that there is a table in the brief that shows that the opening brief, fewer offers than would have been expected through a random distribution. Now, of course, some students in these zip codes are not the there's not all these zip codes are not monolithic. So some students in West Roxbury are black or Hispanic and they would they too would would suffer the penalty of being in a zip code where you did a much higher GPA for admission. However, on the whole, a racial proxy doesn't need to be perfect in order to achieve its goal. For instance, and McCrory also shows that because these were the elimination of seven days of early voting or same day registration or out of precinct voting didn't prevent black voters from voting. In fact, just limited it just the there was actually no evidence at all on turnout that showed that that happened. Actually, black turnout increased after the limitations. So the overall the overall effect of a proxy does not have to be perfect in order for it to still serve as a measure for discrimination. You're familiar with the discussions about affirmative action, whether it should be constitutional or not. And one of the arguments in favor of finding affirmative action unconstitutional is that there are alternative ways of increasing representation of unrepresented or less represented groups without using race as the factor. Socioeconomic status is often cited and then there are debates about whether that's sufficient or not. Isn't the position that you want us to to adopt here would actually say not only can you not use race, but you can't use any other factor that is even correlated with race like socioeconomic status. If you're aware and then what you're doing will change the representation on a racial basis. No, Your Honor. Awareness is is clearly not enough. It's it's suppose you like the result. It was the whole idea in the beginning was we've got this severely underrepresented group. But we can't just say that their race is now going to be a selection criteria. But we can say I want to pick socioeconomic basis, knowing that that will have some effect. And I think you're saying you can't do that at base. That's what you're saying. Your Honor, the standard in Feeney was because of, not in spite of. So if you can show, as in this case, that the reason that as the district court found that the reason the plan was chosen was to produce a particular racial effect, then that moves the case into the strict scrutiny pile. Because then it equates the case with, for instance, cases like Adirondack or Fisher, where race was a factor and strict scrutiny became. What's the particular effect that the plan was designed that you're referring to was designed to achieve? The plan was designed to achieve a measure of racial balance, which in two school committee members spoke very clearly on this. For instance, school committee member Laura Rivera said that she supported this plan as a first step, but it didn't go far enough because the plan would still have 32 percent of the seats achieved or earned by white students. And so it was clearly framed in terms of race that Asian-American and white students would have to decrease. And it's not just that there is a motive for diversity, because that alone is not enough. As this court said in Anderson is not enough to to trigger strict scrutiny. It's the it's the motive and the means. I think as the court said, this panel said in back in past year and the means here are means that do not treat each student equally because a student with a 10.5 GPA in one zip code is not treated the same as a student with a 10.5 GPA and another zip code. And the reason for that is because the zip code quota is intended to act as a racial proxy. And that's why the 10.5. So we have we have one year's worth of data in the record. Does the record also include modeling or does your argument include modeling that extrapolates out over years? And what happens to the percentages under those models? Your Honor, the plan that we challenge is only in effect for one year. So there there is no no data going out into the future. Well, if it's a quota, we we probably don't need we don't need data, right? Because we know what the numbers will be. Well, your Honor, that's really the point of my question. Is that an accurate statement? The numbers will fluctuate and it would fluctuate assuming the program or the challenge policy continued indefinitely. The numbers would fluctuate based on the performance of students in each zip code, the racial composition of each zip code. But as but as it stands now, there is modeling in the record that shows that the working group and BPS expected this racial effect. And they and the school committee members sought this racial effect. And then that racial effect did, in fact, occur when the admissions decisions were made. And so when you come to the remedy you're now seeking is simply admit five children. Yes, Your Honor, because those five students would be would be would have been eligible for admission if GPA and not the zip code were the sole criterion for admission. Now, if there if there's any question about the evidence regarding the five students and whether or not this court could simply order admission, certainly a limited remand could could help resolve the remedy issue. But the district court then would have discretion to fashion a remedy that would resolve the constitutional violation request that relief below. Well, in the district court, Your Honor, we all the proceedings that happened in the district court before the rule 60 B motion were before admissions decisions had been released. So we sought an injunction that would prohibit the school committee from implementing the zip code quota. But once admissions decisions were released, then we then the 14 students were separated into groups of students who got in students who didn't get in. And whether those students would have gotten in but for the zip code quota. And so five of our 14 students, as shown by the Murphy declaration, are would have gotten in. And that's why the remedy we seek now is distinct from what we saw below, because when we when we argue this case below the facts were the circumstances were different. So now with the changed circumstances, we still represent our members and this is a narrow remedy that could make them whole. I only have eight seconds left, so if there are no further questions, I'd ask the court to reverse the judgment. Once the situation changed, you didn't request that relief below. Your Honor, we in the rule 60 B motion, we did argue. It's not in the amended complaint because that was also from earlier. But once once the rule 60 motion was filed, we did say that that was the remedy we were seeking in the rule 60 motion. But the court did not address remedy in the indicative ruling because it ruled against us. One point of clarification on your data with respect to the districts in which it took a higher score to get an invitation. And so there were a group of applicants who had they they did not get an invitation, but had they been in another neighborhood, they might have. With respect to those people, is there anything in the record that shows the race of those people? No, Your Honor. Thank you. Thank you, counsel. At this time, Attorney Hodge, please introduce yourself on the record to begin. Good morning, Your Honors, and may it please the court. My name is Kay Hodge. And with my partner, John Simon, we represent the Boston School Committee. I think that this is an unusual case because this panel has already heard the case once, and albeit in a somewhat different circumstance procedurally. But you've already looked at the legal question of equal protection. And the district court reviewed the case twice. So at this point, we're on our fourth review of the same set of facts. And one of the issues that we raise in our brief, which we believe is an important issue for this court to consider, is the issue of mootness. And I'd like to spend a few minutes talking about that because it wasn't and isn't really addressed in the coalitions, what I'm going to refer to as the coalitions brief in chief. Rather, in their reply, they essentially talk about the fact that they had associational standing. And therefore, they are appropriately raising the question. And in particular, I'd like to address the five students that were just named. First, we don't know who they really are. They've never been disclosed. Two, they're not parties. The only party in this case happens to be the coalition and the Boston School Committee and its various members. Isn't there an allegation that their parents are members of the association? They make the allegation that their parents are members. But they also make the allegation, it's kind of a slip in the materials, that they're now member students, that the students are also members. And remember what you have in the 6DB. And I want to sort of address that somewhat as it's important. It's hard to tell whether I should address it first or I address it second or whatever. Because if you look at the 6DB motion, which was brought by the coalition, what they sought was under 6DB2 to establish either one of two elements. There are four possible elements, but one of two out of the four elements. And that is that this was newly discovered evidence. Or they have to show that it would have changed the result. I would argue first that it wasn't newly discovered. Indeed, if you look at the agreed statement of facts, it was in fact the coalition that proposed putting a text message into the facts, which the school committee agreed to. Which was a transcription of some text messages between Oliver Davila and Rivera. Now, those are the same two people that they seek to have the additional text messages added. Well, the way texts work, as I understand it, and you have to understand that I'm probably the least text savvy person in this room, is that it's a continuation. There's all sorts of messages that go back and forth. I thought you were addressing mootness. I was going to also address mootness. I'm just stressing to you on the 6DB2, the fact of the matter is that first of all, you should affirm the district court's decision. And if you affirm the district court's decision... But if it's moot, we would just dismiss the case as moot. Well, we would argue you ought to dismiss the case as moot because, A, what the coalition asked for in the first instance was an injunction. An injunction from the implementation of this plan. It's now clear it's over. It has been replaced by another plan. This was a one-year COVID-inspired or COVID-required solution. Right, but suppose five of their members... Suppose the plan was unconstitutional, but it's now been put in. So getting an injunction against the plan is no longer available. But five of their members were excluded because of an unconstitutional plan. Would that be moot? No, it may not be moot depending on the procedural posture of those cases. So why is this one moot and that one wouldn't be? Because in this one, you have only associational standing. And the individuals were not brought in as individual plaintiffs. And as the Supreme Court has said in Warden, I believe it's Warden v. Selden, it is that individuals must have standing to obtain a remedy. And in these cases, we don't know who they are. We don't know exactly their circumstance. Now, let me just give you an example. Under the plan, it is clear. Had they... Sorry, I'm sorry, Judge. You said we don't know who they are or their circumstance. The allegation is that they had a test score, a GPA, that would have admitted them. Do we need to know more than that? Do we need to know who specifically? Your Honor, that allegation is only in an affidavit from an individual with the last name of Murphy. We do not know except that she purports to be a member of this association. And she says that she knows that that's what their grade points were and that they would have gotten in. I don't even know the basis of that conclusion on her part. But issue two is we have never had a plan in the city of Boston for acceptance to the exam schools that was solely based upon GPA citywide. Two, in this particular plan, it is clear that those students in West Roxbury who may have had high GPAs were not as high as those in West Roxbury that got in. Because 10% in the plan, 20% out of 100% were admitted citywide based upon their GPA, period. They would, obviously, these five individuals were not in that particular group. But issue two is they also had to be in that top group and also have selected their first choice school had to have seats available. And so we also don't know if these particular students selected anything other than, for example, the most popular school is Boston Latin. If they all selected only Boston Latin by the time they got to their particular GPA, there may not have been any more schools available in Boston Latin and others were accepted in one of the other exam schools. All of that individualized review happens not when you have an association, quote, unquote, asserting that these are their members, but when an individual is, you can have an association, Judge Kayada, the associational membership, and you can have individual plaintiffs. Here, none of these individuals were plaintiffs. And the only evidence you have is by way of the affidavit. It is our argument that you don't consider the affidavit. Why? It's post-judgment and it's brought in in support of a 60B, which was why I was getting caught up in the 60B argument, because it's all a question of what is available for consideration at this moment in time by the court. What the court made its decision based upon were the stipulated facts. It analyzed them extensively. You referenced that in your opinion, denying the preliminary injunction. And in addition, it found that there was no equal protection violation by zip codes, which are by their nature not race-centric. Obviously, people live in certain places, but the zip codes were not intended to be racial. If you read... What do you mean when you say they weren't? Are you saying that the zip codes weren't picked because they would contribute towards ameliorating the underrepresentation of minority groups? I think that they were picked for three reasons. First of all, it was geographic, that they wanted to make sure that in this one year in which there were unique challenges being faced by particularly economically disadvantaged families and children, that they would, in fact, provide some geographic breadth. What's the finding on that purpose of selecting the groups by the district court? The district court found all three together were reasons why this plan was adopted. They did not, as stated by counsel for the coalition, the district court at no time found that the reason this was adopted was race. They found that the purposes were geographic, socioeconomic, and also race. That's how you read even its post-60B pronouncements for me? That's how you read the court's post-60B pronouncements? The district court? Yes. It's indicative ruling. It's indicative ruling. It is our view that it continues. It's not just... It was not... The zip codes were not selected because of race. The zip codes were selected because it was a methodology that would mitigate and would try to mitigate against the grade inflation concerns of members of the school committee, and they keep bringing up West Roxbury. So it's important to point out that there is an agreed statement of facts that there is one school in West Roxbury that had historically given A-plus grades to a lot of their students and had disproportionately gotten their students admitted to the Boston Latin School. There was also undisputed evidence that across the city of Boston there is no clear criteria. There's no methodology for grading that ensures consistency, and there clearly is no consistency between city of Boston schools and schools outside. That is why they chose not to go with just a grade GPA only plan because it would kind of advantage those who receive certain kinds or certain levels of grades. On the mootness subject, first our argument is that there isn't anything to enjoin any longer, and Judge Kayada, I would argue that those five... A court could issue an injunction saying, You could, but they're not even parties to this case. And I believe it is our position that the associational standing, which we have argued is an issue all along, is extremely important with regard to whether you can give a remedy. I mean, it's easy to say, oh, this is an issue of remedy, so let's now take it up. No, you have to go back and make sure that those to whom you're giving a remedy, in fact, were a part of the case throughout the case before judgment was issued. Are you arguing the third prong of Hunt is, as a prudential matter, we should say that in this case to deliver the relief requested, we need more of an involvement of the individuals? It is our view that that's absolutely correct, and I've just explained how that affects both the substance. It's not just a GPA only issue. It's what school did you select? Where would you have fallen? There may have been others with the same grades. And I think that the school committee has the right to make decisions, as they did in this case, and there is also documentation among the simulations, that there is a persistence level that if you got a B+, the kids who got a B-plus average did as well in the select exam schools as did those who received other grades. Let me ask you a practical question. Assume there was a constitutional, I'm not saying there was, as you know from our prior finding, but assume there was a constitutional filing. If we dismiss this case for mootness, what would those five students then be able to do or not do? I don't know anything about them, so I can't. Couldn't they bring this exact same case? They could try. What would stand in their way? I don't know of anything. I think that they would be within the time limit. They could certainly try, yes. But as a practical matter, cases are what they are, time is what it is, and presumably they're in school presently. And the question would be would they, you know, as a practical matter, I'm not sure exactly how that would work out practically. So our arguments are mootness, the fact that you should, in fact, affirm the district court's indicative ruling, which denied the 60B, which was essentially 60B2, and because there was no abuse of discretion and it is an extraordinary relief. And the judge was in the right position to make that decision. And the third is under equal protection you have plumbed that in the original decision, which is that you rely on Anderson. And since Anderson there's been nothing that has significantly changed because the Parents United, the Parents Seattle case is not a case, it was a case where race was used in selecting that particular criteria. And we would argue there's no evidence, if I could just conclude, we would argue that there's no evidence of either invidious discriminatory intent or purpose in the adoption of this particular zip code plan that did not set how many kids, whatever race would get admitted, but merely established a methodology for going across the city when they could not give an exam. What should a court do if it found that the selection criteria were changed to adopt facially neutral criteria, but it was done so because the decision maker was aware of and wanted to change the racial makeup of the entering class and it was done to pick the particular racially neutral criteria that would have that effect and that was intended. What would a court then do? I think that the court goes through the analysis, which is that it's race neutral. And if it is race neutral, then you look at disparate impact and then you look also at whether or not there's invidious discriminatory intent or purpose. Disparate impact is there to take a neutral criteria, which has a disparity of impact. What is wrong with the way the coalition has looked at this particular subject is they want to bake in that 2020-2021 is the baseline. So in a situation as the district court found specifically, in this situation it bakes in the status quo. So because whites and Asians were overrepresented, that should be the baseline that the assumption is that they have a right to continue to be overrepresented and if they lose seats, that's discriminatory. Abandoning that baseline and adopting this new baseline of looking at each district, assuming there should have been an average acceptance rate of applicants in that district and then comparing the results to that average of 58% or whatever it was. I don't think that random selection in that regard, I'm not sure would necessarily be statistically significant because remember, as this court has reviewed extensively both in Jones and in Lopez, the issue of statistical significance has many, many pieces and it is through the statistical analysis that one determines that the only conceivable probable reason for this outcome was race and I don't believe that that is true necessarily here and the fact of the matter is, as we would argue, that without that data, I certainly can't give you a back-of-the-envelope view of whether or not I think that this is or is not statistically significant. With that, we would rest on our brief and ask that the court affirm the district court's decision. You have two appeals before you. Affirm the district court's decision pre-judgment and then affirm the indicative ruling. Thank you. Thank you, counsel. At this time, if counsel for the NAACP would introduce herself on the record to begin, she has six minutes. Thank you. Good afternoon. May it please the court. My name is Doreen Rochelle and we represent the Defendant Intervenors Appealees in this matter. For this particular oral argument, I'd like to focus my argument on the district court's correct finding below that the interim plan has no disparate impact on white and Asian American students and does not thus violate the Equal Protection Clause of the 14th Amendment. The coalition fails to establish disparate impact below for several reasons. The coalition uses incorrect comparators. They fail to present any sort of expert evidence below. The record is devoid of any evidence of statistical significance and the data proffered by the coalition is heavily mischaracterized. First, turning to the use of wrong comparators. The coalition tries to muddy the waters here related to disparate impact because it uses the wrong comparators. The coalition incorrectly compares percentages of white and Asian American students who were admitted under a prior year admissions process to the same percentages of the same students who were admitted under the interim plan. And they also incorrectly claim that a year-over-year analysis is appropriate to determine disparate impact. As the district court found below, and as this court has previously held in its prior decision in this matter, the appropriate analysis is to actually compare the percentage of each group admitted to the schools to their percentage in the overall pool of school-aged children. And if you use that proper standard here, it will show that the interim plan actually had no adverse impact on white and Asian American students, as the district court correctly found below. To illustrate, if you combined the percentage of school-aged children for Asian American and the white population, you come up with a total of 72%. Compare that to the number or the percentage of admitted students, you get 46%. And then let's compare that to blacks and Latinx population. If you compare the total number or the percentage of the school-aged population that falls under that particular category, I'm sorry, let me take that back. If you combine the total number of blacks and Latinx students, you come up with a total percentage of 72%. However, the percentage of admitted students was only 46%. If you look at the inverse, the total amount or the percentage of school-aged children of Asian Americans and white students, you get 23%. However, the percentage of admitted students under the implemented plan is 49% of the admitted students. So as this clearly shows, the inverse is actually correct, that white and Asian American students continue to be overrepresented while black and Latinx students remain underrepresented, even under this particular interim plan. Additionally, accepting the coalition's use of the wrong comparators and a sort of year-over-year analysis would actually – I thought they were putting forward something other than the year-over-year now. I thought they were looking at zip code differences. In other words, some zip codes would have effectively required higher score to pass than others. And so if you were in one zip code, you got in, but if you were in another zip code, you didn't get in. That's correct, Your Honor. But also moving towards the other sort of – Well, the flaw is that they offer no expert evidence. They don't, in their pleadings below and their pleadings before this court, they don't indicate why they're using the comparators they are. There's no expert evidence to suggest statistical significance or to analyze why the comparators are valid and substantiate and support their disparate impact claim. I just wanted to point to one particular sample that they've used, which is under their view, if there was a citywide GPA competition amongst all students, they would actually stand to gain 65 more seats for both white and Asian American students, which would exasperate the already overrepresented population that they have in these three exam schools. The other flaw that I wanted to point out to you is the mischaracterization and how they characterize zip codes. And this is why it is so important to use experts to analyze the data. In particular, half of the 10 zip codes that the coalition identifies as white and Asian Americans in their charts, which are all lawyer-generated, have a higher percentage of Latinx than Asian Americans in those zip codes. Similarly, four of the zip codes that the coalition labels as white and Asian Americans have a higher percentage of African Americans than Asian Americans. So as you can see, the data that they are representing and they are characterizing is flawed at best. What case would you point us to that we should look to most closely for the proposition that intentionally using a neutral, facially neutral factor to decrease the amount of underrepresentation of a group is okay? Well, it's clear here based on the record that what we're dealing with is a facially race-neutral plan. And I would point this court to its decision in Anderson as being applicable. And just a few things to note about this particular plan, it doesn't include racial classifications. It wasn't adopted with any sort of discriminatory purpose. It wasn't applied in a discriminatory manner. It doesn't use racial quotas. Their argument is that the evidence is overwhelming that it was selected precisely for a racial purpose. I would respectfully disagree with that, Your Honor. If you look in the record, the working group analyzed a number of different simulations. In fact, there are some simulations in the record that show that if the school committee would have adopted them, it would have moved the needle a lot more than the interim plan would have in terms of increasing the numbers of African American and Latinx students. Instead, the committee chose this particular plan. And the reason was they wanted to have a plan that dealt with the COVID pandemic issues and also develop a plan that would provide more equity. And this court has held that just because a school committee like the one at issue here considers equity, that does not necessarily convert the analysis to a strict scrutiny analysis, nor does it turn a facially-neutral plan into something otherwise. But their argument is that the zip codes are a proxy for race and that the committee knew that at the time it adopted it, and regardless of whether there may have been others that have achieved greater diversity, this one achieved some, a significant amount, and that when you look at the animus displayed by the three committee members, then that would be proof that it was done for a racially improper person and it engenders strict scrutiny. Two things on that, Judge Thompson. One, it is true that the school committee used a number of factors, including geography, socioeconomics, and race. However, if you look back in the record, it's clear that even with the adoption of the plan, they were very focused on socioeconomics. And the reason I say that is because when they were adopting the plan, they considered two additional modifications to the plan, which goes to the heart of this. First, they added an additional zip code for applicants who are homeless or in DCF custody. And number two, they also ranked the zip codes by median income of families of school-age children. And they did this to better reflect the socioeconomic conditions of student applicants. In both of these modifications, race was never considered. In addition to that, Your Honor, I just wanted to point out, in terms of the percentages or the barometer that we're using, comparing the prior plan with the interim plan, it is true that there was a slight increase. In fact, I want to point to this Court's decision in that you've already said here that the projected numbers do not necessarily show disparate impact. They don't rise to the level of showing disparate impact. And the actual numbers that we have now with the implementation of the plan are pretty in line with the numbers you've already said don't rise to the level of disparate impact. So with that, it's clear that the school committee was concerned about this particular plan and what plan to implement because of the COVID pandemic. But in actuality, it used a wide range of factors. Geography, GPA, race was also considered as well as socioeconomics. Its zip code was not used for a proxy for race. Counselor, before you sit down, did you want to say anything about the mootness argument? We rely on our briefs on that particular issue, Your Honor. Thank you. At this time, if Mr. Kieser could please reintroduce himself on the record. 30-minute rebuttal. Thank you, Chris Kieser for the coalition. I just want to make a few points. First of all, with respect to the district court's findings that was discussed by a counsel for the school committee, the initial opinion that the district court issued back in April was retracted by the court, I believe, in July. So the only opinion that the district court has ever issued in this case that hasn't been retracted is the indicative ruling in October. And in that ruling, the court specifically found that three of the seven members exhibited some form of racial animus and that the plan was chosen precisely because of its effects on racial demographics. So I think those can be treated as findings, and our gripe with the district court is on its application of those findings, what we believe is a misapplication of Arlington Heights and Feeney, but those factual findings, we agree with those. I still come back to, and I'm trying to understand where you're ultimately going. As you know, there's debate and decision in a case before the court, the high court, on whether you can use racial identity to increase diversity in an educational institution there, a college. You seem to be going a step beyond that. You seem to be saying you can't use nonracial, facially neutral factors if your purpose is to increase diversity. Your Honor, I think it's been well established. I mean, going back to, for instance, even going back to cases like Yickwo, but certainly Arlington Heights and Feeney, that you cannot use facially neutral criteria in order to achieve racial discrimination. And that's exactly what we are. So it makes a difference. Racial discrimination and diversity is the same in that formulation. Well, I mean, Your Honor, the court has, in cases like Adirond and Fisher, said that the affirmative action racial preferences in college admissions and in contracting merits strict scrutiny because they are a form of racial discrimination. So that is why they get strict scrutiny. You would have us take race-neutral selection criteria, not race, and put that into the same box if the race-neutral criteria were selected precisely because it would produce an underrepresentation of one racial group. Your Honor, Arlington Heights is a totality of the circumstances test, so it would certainly not be the case that every time a school committee considers socioeconomic factors that that would be an equal protection violation. But in a case like this, where three out of the seven members exhibited, according to the district court, racial animus, and that the zip code quota was chosen precisely because of its racial effects, that would be enough under Arlington Heights to demonstrate discriminatory intent. Because under Arlington Heights, I'm sorry if I can finish this answer, one only has to show that race is one, in part, a factor. And here, so even if we assume that socioeconomics and geography were also factors, it's clear from the record that, especially given the district court's findings, that race was at least one factor here in determining the usage of the zip code quota. And the record shows there's more than that, given the findings here. I think that, are there any more questions for counsel? Thank you. Thank you, Your Honor. That concludes the argument in this case. All rise. This case is now recessed. God save the United States of America and this honorable court.